**KRAUSZ INDUSTRIES LTD., formerly known as Krausz Metal Industries, Ltd., Plaintiff,**

**v.**

**SMITH–BLAIR, INC.; Sensus USA, Inc.; and Sensus Manufacturing Shanghai Ltd., Defendants.**

**No. 5:12–CV–570–FL.**

United States District Court, E.D. North Carolina, Western Division.

Signed Aug. 3, 2015.

Lance A. Lawson, Anthony Paul Derosa, Lynne A. Borchers, Myers Bigel Sibley & Sajovec, P.A., Raleigh, NC, for Plaintiff.

Francisco J. Benzoni, Robert J. Morris, Smith Anderson Blount Dorsett Mitchell & Jernigan, LLP, Raleigh, NC, for Defendants.

CLAIM CONSTRUCTION ORDER

LOUISE W. FLANAGAN, District Judge.

This matter is before the court for a claim construction order. The parties filed a joint claim construction statement and claim construction briefs, as well as responses, a reply, and a surreply. The

court held a claim construction hearing on March 10, 2015, and took the matter under advisement. In this posture, the issues raised are ripe for ruling. The court sets forth below its decision on the parties' disputed claim terms.

## BACKGROUND

Plaintiff filed suit in August 2012 alleging patent infringement by defendants. Plaintiff seeks a declaration of infringement, monetary damages, and injunctive relief to prevent continuing infringement. Plaintiff claims that defendants market a pipe coupling device (the "421 Top Bolt ®") that infringes a patent owned by plaintiff, U.S. Patent No. 6,293,556 (the "'556 Patent" or "the patent"), attached hereto as Exhibit A. The '556 Patent issued in 2001, and was reconfirmed in 2012.

By way of summary, the patent describes in its abstract a "Coupling and Connecting Means for pipes of the same or different diameters and a seal to be used with such connecting means." ('556 Patent, Abstract (DE 24–1 at 2)).[1] The three claims of the patent are as follows:

1. A sealing ring for pipe connector means made of resilient material, the sealing ring comprising a first sleeve-like ring the cross section of which defines a[sic] inner space therein, and a second ring overriding said first sleeve-like ring and being loosely connected to said first ring, said second ring being adapted to be torn off said first ring at a predetermined location so as to adapt the sealing ring to interconnect pipes of substantially different diameters.

2. A sealing ring as claimed in claim 1 where said second ring is integral with said first ring.

3. A sealing ring as claimed in claim 1 where said seal is incorporated with connecting means provided with a U shape ring and placed within said U shaped ring.

(*Id.* Col. 2, lines 42–54). Plaintiff alleges infringement of claim 1 and claim 3 of the patent, although terms in each of the three claims are in dispute.

As required by the court's January 15, 2014 case management order and Local Patent Rule 304.3, the parties filed a joint claim construction statement on June 16, 2014, setting forth 14 disputed claim terms and proposed constructions for each. The parties filed opening claim construction briefs and responsive claim construction briefs in July and August, 2014.

On August 18, 2014, plaintiff moved to strike portions of defendants' opening claim construction brief, arguing that pictures alleged to be of plaintiff's and defendants' products contained in defendants' brief are improper and not relevant to claim construction. By order entered December 15, 2014, the court rejected this argument, reasoning that such pictures could be useful for illustrative purposes, and that the court may consider at the claim construction hearing examples of the parties' products for purposes of tutorial on the background of the relevant field of art. The court noted it would be mindful of the proper use of such evidence for background purposes only.

On September 2, 2014, plaintiff moved for leave to file a reply brief in order to respond to defendants' arguments challenging plaintiff's expert qualifications and testimony. The court granted plaintiff leave to file a reply and allowed defendants to file a surreply. The court held a claim

---

1. Except where otherwise expressly noted, all citations to documents using the docket entry number (DE) provided in the court's docket, including briefs and exhibits thereto, will specify the page number automatically designated by the CM/ECF system, rather than the page number, if any, specified on the original document.

construction hearing on March 10, 2015, at which the court heard presentations by counsel for both parties, including initial presentations in the nature of a tutorial and argument regarding disputed claim terms.

## DISCUSSION

A. Claim construction principles and procedures

■ Analysis of infringement involves two steps. "The first step is determining the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc) "The second step is comparing the properly construed claims to the device accused of infringing." *Id.* It is the first step, "commonly known as claim construction or interpretation," that is at issue at the present stage of this case. *Id.*

The first "two paragraphs of section 112 frame the issue of claim interpretation for [the court]." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (citing 35 U.S.C. § 112).[2] "The second paragraph requires us to look to the language of the claims to determine what the applicant regards as his invention." *Id.* (internal quotations omitted). "On the other hand, the first paragraph requires that the specification describe the invention set forth in the claims." *Id.* A third component of a patent for claim construction purposes is the "prosecution history." *Markman*, 52 F.3d at 980. Prosecution history is the "public record" of proceedings in the Patent and Trademark Office, which may include statements by the inventor, or on his behalf, while a patent application is pending approval. *Id.*

■ It is the court's role in claim construction to "analyze the text of the patent and its associated public record and apply the established rules of construction, and in that way arrive at the true and consistent scope of the patent owner's rights to be given legal effect." *Id.* at 979. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotations omitted). Thus, the goal of claim construction is to determine the meaning of the claims. *See id.*

■ "To ascertain the meaning of claims," the court must consider primarily the "intrinsic record," comprised of "the claims, the specification, and the prosecution history." *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1313. Secondarily, the court may consider "extrinsic evidence" in the form of expert testimony, technical information and dictionaries. *Id.*

1. Intrinsic Evidence

■ "[T]he words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (internal quotations omitted). In turn, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. In addition, the claims "must be read in view of the specification, of which they are a part." *Id.* at 1315 (quotations omitted). "[T]he specification is always highly relevant to the

---

2. "Paragraph 1 of 35 U.S.C. § 112 was replaced with newly designated § 112(a) by § 4(c) of the Leahy–Smith America Invents Act ('AIA'), Pub. L. No. 112–29, and AIA § 4(e) makes those changes applicable 'to any patent application that is filed on or after' September 16, 2012. Because the application[] resulting in the patent[] at issue in this case [was] filed before that date, [the court] will refer to the pre-AIA version of § 112." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1183 (Fed.Cir.2014).

claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (internal quotations omitted).

"[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Id.* at 1323. "Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.*

■ "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317. Nevertheless, the court cannot "rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M Innovative Properties v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir.2013).

### 2. Extrinsic Evidence

"Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [the court has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).

■■ "[E]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, *or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."* *Id.* at 1318 (emphasis added). "A trial judge has sole discretion to decide whether or not [she] needs, or even just desires, an expert's assistance to understand a patent. [The Federal Circuit] will not disturb that discretionary decision except in the clearest case." *Markman*, 52 F.3d at 981. "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318.

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, — U.S. —, 135 S.Ct. 831, 841, — L.Ed.2d — (2015). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." *Id.* "For example, if a district court resolves a dispute between experts and makes a factual finding that, in general, a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention, the district court must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term in the context of the specific patent claim under review." *Id.* "That is because experts may be examined to explain terms of art, and the state of the art, at any given time, but they cannot be used to prove the proper or legal construction of

any instrument of writing." *Id.* (quotations omitted).

## B. Analysis

The parties dispute 14 claim terms, which the court will take up in turn below.[3]

### 1. "the cross section of which defines a[sic] inner space therein"

- Plaintiff's proposed construction: "the cross sectional shape of the gasket does not present itself as a solid area but has a portion of the cross sectional area where there is no gasket material, thus forming a void or inner space."

- Defendants' proposed construction: "the cross section of the first ring-shaped gasket layer defines a distinct hollow annular chamber located completely inside the first ring-shaped gasket layer that is in communication with liquid within the pipes via a separate structure such as a slot or aperture."

- Court's construction: "the cross section of the first ring defines a space inside the cross section, in contrast to being on the outside or edge of the cross section."

The claim term "the cross section of which defines a[sic] inner space therein" appears in the first claim in the patent. ('556 Patent, Col. 2, lines 44–45). The plain language of the term, and the context in which it appears, informs the court's construction. The words used in the term have a simple, descriptive, and non-technical meaning, and the first seven words are not in need of further construction.[4] The meaning of the combination of words "inner space therein," however, is sharply disputed by the parties. By using the adjectives "inner" and "therein," the term describes the position of the space described, in relation to the cross section of the first ring. In particular, it is a space inside the cross section, in contrast to being on the outside or periphery of the cross section.

Contrasting the space inside the first ring with a space on the outside is helpful to understanding the bounds of the term, where the claims and specification also describe the first ring being "loosely connected" to the second ring. ('556 Patent, Col. 1, lines 45–47; Col. 2, lines 45–46). In conjunction with describing this loose connection, the figures in the specification

---

3. Plaintiff argues that this court should defer to an earlier ruling on construction of the same patent claims by the Western District of Washington. That court, in an unpublished claim construction order entered July 11, 2011, set forth its construction of disputed claims following a *Markman* hearing. *See Krausz Indus. v. Romac Indus., Inc.*, No. C10–1204RSL, 2011 WL 2690608, at *1 (W.D.Wash. July 11, 2011). Plaintiff's argument is unavailing for several reasons. First, defendants were not parties to the *Romac* patent case. Second, *Romac* settled prior to final judgment. *See Lexington Luminance LLC v. Amazon.com Inc.*, 601 Fed.Appx. 963, 969 (Fed.Cir.2015). Third, *Romac* only construed some of the claim terms presently in dispute. Thus, at best, *Romac* can provide persuasive authority on some of the claim terms in dispute, and the court will consider the case in this light.

4. The claim term refers back to "a first sleeve-like ring," the cross-section of which is defined in this term. ('556 Patent, Col. 2, lines 43–44). In their proposed constructions, the parties refer to "the first ring-shaped *gasket* layer" and "the *gasket*," respectively. (DE 55–2 (emphasis added)). Both parties propose using the word "gasket," reflecting their agreements on construction of the claim terms "sealing ring" and "sleeve-like ring." (*See* DE 55–1; 55–3; 55–4). The parties, however, do not provide any argument or information regarding the meaning of the word "gasket." (*See id.; cf.* DE 60 at 9). Thus, in construing the disputed claim terms, the court will use the words "first sleeve-like ring," or the shorthand "first ring" and "second ring," as those are the words used in the claim itself, rather than the word "gasket."

show a preferred embodiment with an indentation, groove, or notch at the edge of the first ring. (*Id.,* Figures 1, 2, 4, and 5). Figure 6 also shows an indentation on the outside of the cross section of the first sealing ring, in contrast to a space on the inside of the ring. (*Id.,* Figure 6).

This construction based on the intrinsic evidence also is consistent with dictionary definitions of the claim terms, including dictionary definitions proposed by defendants. For example, defendants cite to dictionaries defining "inner" as "located or occurring farther inside: an inner room; an inner layer of warm clothing," or "situated farther in [the ~bark]." (DE 55–4) (quoting American Heritage Dictionary (3d ed.1992), and Merriam Webster's Collegiate Dictionary (10th ed.1996)). These and other dictionaries similarly describe that "inner" is in contrast to outer or on the edge of something. *See* http://www.merriam-webster.com/dictionary/inner (defining "inner" as "located toward the inside of something: *not on, or at the edge or outside of something")* (emphasis added); Oxford English Dictionary, available at www.oed.com (defining "inner," as "A. *adj.* 1. Situated more within; more or further inward; interior. Often with a positive force, *antithetical, not to in, but to outer:* Situated within or inside; inward; internal.") (emphasis added).[5] In this respect, defendants' proposed construction captures some of the relational aspects of the cross-sectional space being described.[6]

Nevertheless, contrary to defendants' proposed construction, the claim does not require the variety of additional specific limitations which defendants import into the term: such as "distinct hollow annular chamber," "completely inside," and "separate structure," and "in communication . . . via a separate structure such as a slot or aperture." (DE 55–4). Other than being a space inside the cross section, the claim does not require a particular shape, structure, or manner of communication with the fluid in the pipes. Where the claim describes the cross-sectional area without such limitations, a broad construction is warranted. *See Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1367 (Fed.Cir.2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

For example, adding the words "annular," "chamber," and "completely inside" to the construction interjects structural limitations on the space beyond what is required by "inner" and "therein." In particular, these additional words connote an enclosed space and structure, whereas "inner" and "therein" are positional. For example, the "ordinary definition of 'annular' is . . . of or relating to an area formed by *two concentric circular or curved regions."* *Int'l Rectifier Corp. v. IXYS*

---

5. Where there is no suggestion that the common, ordinary, meaning of any word in the claim has changed since the patent application was submitted, the court cites to readily-accessible online versions of the dictionaries cited.

6. Plaintiff's proposed construction is less helpful because it merely repeats the most critical words in dispute, "inner space." (DE 55–3 at 2). The report by plaintiff's expert also is less helpful for the same reason. (*See* DE 61–2). However, some of the testimony of plaintiff's expert is probative to how a person skilled in the art would understand the term "inner space," where plaintiff's expert explained his understanding that an "inner space" does not include a mere "tongue and groove connection[] between the two gaskets," a "recess for the tongue and groove," or a "recess for a connection between the two gaskets." (*See* DE 74–4 at 177–178, 181). Where consistent with the intrinsic record, such testimony provides further support for the court's construction.

*Corp.*, 361 F.3d 1363, 1373 (Fed.Cir.2004) (emphasis added, citation omitted). A "chamber" commonly is defined as a "1: ROOM," or "2: a natural or artificial *enclosed* space or cavity." http://www. merriam-webster.com/dictionary/chamber (emphasis added). By contrast, a space may be situated inside the first ring but still oriented or shaped such that there is no dividing structure or line between the inner space and the outside of the first ring. In this same manner, based on the broad language of the claim term, the "inner space" need not be "in communication via a *separate* structure such as a slot or aperture," as defendants propose. (DE 55–4) (emphasis added).

The limitation of communication with the liquid in the pipes is introduced as part of a preferred embodiment of the claimed invention. In particular, in describing the "preferred embodiment," the specification states: "The inner space 3 is in communication with the liquid within the pipes thus when pressured fluid is delivered through the pipes said fluid enters space 3 and applies pressure therein which inevitably adds to the tightening of the seal." ('556 Patent, Col. 2, lines 30–34 (emphasis added); *see also* Col. 2, lines 16–18 (referencing connection of pipes with "tight seal")). Such communication and resulting tightening of the seal, however, is not a requirement of the claims, nor is it a stated purpose of the invention. (*See id.* Col. 1, lines 24–47; Col. 2, lines 42–54). This limitation thus properly is not incorporated into the construction of the claim. *Cf. Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed.Cir.1998) (relying, in part, on the stated purpose of the invention in construing the claims).

Defendants argue the '556 patent illustrates "[t]he invention" through a single embodiment shown in the patent figures, and thus the claims should be limited to that embodiment. (DE. 66 at 14). The premise of defendants' argument, however, is flawed in two respects. First, the figures do not illustrate a single embodiment, but rather, two different embodiments of the seal: Figures 1 through 5 illustrate one seal, with an inner space roughly square-shaped; Figure 6 illustrates another kind of seal, with an inner space comprising a larger chamber with an extension that is roughly rectangular. Second, the patent does not state that the figures illustrate the invention. Rather, the patent states:

> The invention will now be described *with reference to* the annexed drawings in which:
>
> FIG. 1 is a cross section of a seal profile,
>
> FIG. 2 is a cross section of a seal profile *embodiment*,
>
> FIG. 3, 4, and 5 demonstrate three ways of the use of the seal with respective connecting means, and
>
> FIG. 6 illustrates *an embodiment of a seal according to the invention*.

('556 Patent, Col. 1, lines 51–56; Col. 2, lines 1–2 (emphasis added)). By describing the invention with reference to the figures, denoted as illustrations of embodiments, the patent is setting out specific examples of embodiments of the seal without limiting the meaning of "inner space therein" to those embodiments. *See Phillips*, 415 F.3d at 1323. There is no indication in claims or specification that "the patentee ... intend[ed] for the claims and the embodiments in the specification to be strictly coextensive." *Id.*

■ "[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect[,] ... unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova/Pure, Inc. v. Safari Water Filtra-*

*tion Systems, Inc.,* 381 F.3d 1111, 1117 (Fed.Cir.2004); *see Saunders Group, Inc. v. Comfortrac, Inc.,* 492 F.3d 1326, 1333 (Fed.Cir.2007) (refusing to import specific components mentioned in written description, where the passages in the specification "do not expressly state that the [component in question] is an essential component of the invention"). Here, there is no such expression of manifest exclusion or restriction serving to limit the claim scope based upon the description in the specification.

Defendants also suggest that descriptions in prosecution history of the patent and a related patent narrow the scope of the claim terms. In particular, defendants cite to an application leading to U.S. Patent No. 5,941,576, issued August 24, 1999, to Eliezer Krauz, stating that "in the embodiment shown there is provided a seal having an inner space 4' and small apertures 4"" which would enable the fluid within the pipes 12 to enter space 4' and apply pressure on pipe 12." (DE 55–4 at 2; DE 64–16 at 6). Defendants also cite to U.S. Patent App. No. 09/069,548, filed April 30, 1998, stating that the "annular sealing element further features an inner annular hollow in fluid communication with at least one lateral aperture" and "preferably features an inner annular hollow associated with a slit," or a "number of small apertures." (DE 55–4 at 2–3; DE 64–17 at 14).

 "[A] statement made by the patentee during prosecution history of a patent in the same family as the patent-in-suit can operate as a disclaimer." *Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d 1295, 1306 (Fed.Cir.2007). Nevertheless, the court cannot "rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M Innovative*

*Properties v. Tredegar Corp.,* 725 F.3d 1315, 1322 (Fed.Cir.2013). "[T]he doctrine of prosecution disclaimer only applies to unambiguous disavowals." *Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282, 1289 (Fed.Cir. 2009).

Here, none of the specific descriptive terms found in the patent applications, such as "small apertures," "annular hollow," or "slit," appear in the specification of the '556 patent. Indeed, the fact that the more specific descriptive terms appear in a different patent application, but not in the application for the patent in suit, tends to show that the inventor did not intend to so limit the '556 patent claims. In any event, the patent applications do not constitute an unambiguous disavowal of claim scope. Rather, they describe an "embodiment" or what an embodiment "preferably features." (DE 64–16 at 6; DE 64–17 at 14). Accordingly, the cited patent applications do not limit the scope of the claims in the '556 patent.

In sum, the claim term "the cross section of which defines a[sic] inner space therein" means "the cross section of the first ring defines a space inside the cross section, in contrast to being on the outside or edge of the cross section."

### 2. *"overriding said first sleeve-like ring"*

- Plaintiff's proposed construction: "overlapping or covering said first sleeve-like ring."

- Defendants' proposed construction: "seated within and extending axially beyond only one radial side of the first-ring shaped gasket layer."

- Court's construction: "overlapping or extending over said first sleeve-like ring."

 The claim provides in simple terms for a second ring "overriding" the

first sleeve-like ring. ('556 Patent, Col. 2, lines 44–45). The parties dispute the extent to which the second ring overrides the first ring. As an initial matter, the parties are in accord that the ordinary definition of "override" is "to extend over; overlap." (DE 55–3 at 2; DE 55–4 at 4) (quoting The American Heritage Dictionary of the English Language (3d ed.1997)). Apart from this broad meaning, nothing in the claims or the specification requires a particular type of extension or overlap.

Defendants argue that the court should limit the scope of the claim to the preferred embodiment illustrated in the figures to the patent, which show the second ring extending beyond only one side of the first ring. As with the first disputed claim term construed by the court, however, the specification does not show a clear intent to limit the construction of the claim term to the features of the preferred embodiment. While the embodiment shows the second ring extending beyond only one side of the first sleeve, the broad language of the claim term allows for the second ring to extend beyond one or both sides of the first sleeve. Accordingly, the court adopts a construction of the term based on its plain language and context within the patent.[7]

In sum, "overriding said first sleeve-like ring" means "overlapping or extending over said first sleeve-like ring."

### 3. "loosely connected to said first ring"

- Plaintiff's proposed construction: "the two seal rings, which can be individual rings, are joined or linked together, for example, as by means of one or more matching protrusions and recesses built into the mating surfaces of the rings."
- Defendants' proposed construction: "joined or fastened to the first ring-shaped gasket layer so as to allow for partial separation without tearing."
- Court's construction: "joined or linked to the first ring."

▮▮ The term "loosely connected to said first ring" describes the manner in which the first ring is joined to the second ring. By using the adverb "loosely" the claim connotes joining or fastening in a manner that need not be rigid or secure but rather allowing for easy separation or disconnection between the rings. A broad construction of "loosely connected" is consistent with other references in the specification. For example, the abstract of the '556 Patent describes the seal rings as being connected "in a manner which will allow easy disconnecting the second ring from the first ring." ('556 Patent, Abstract). The patent further describes the second ring "loosely connected to said first ring which enables the tearing off of said second ring." (*Id.*, Col. 1, lines 45–47).

In describing the preferred embodiment, in reference to figure 1, the specification states that "[t]he seal is divided into two main parts, the first part 1 being a sleeve-like ring which is preferably provided with inner space 3 to which reference will be made, and the second ring part 5 *which is connected* to said first sleeve part at 7." ('556 Patent, Col. 2, lines 6–11 (emphasis added)). Notably, in describing this preferred embodiment, the specification does

---

7. Plaintiff does not provide a basis for construing "overriding" as "overlapping or *covering*" as opposed to "overlapping or *extending over,*" which is consistent with the ordinary dictionary meaning of the term. Contrary to the suggestion in plaintiff's argument, the prosecution history it references does not include any reference to "covering." (*Compare* DE 60 at 13 *with* DE 61–4 at 5). In addition, plaintiff's expert does not explain the change to "covering" even though he cites to the same dictionary definition noted above in explaining his understanding of the term. (DE 61–2).

not use the adverb "loosely," whereas the claim uses the adverb "loosely" to describe the connection. (*Compare id.* with Col. 2, line 46). Thus, the claim language is broader than the language used to describe the preferred embodiment.

In addition, the illustration of the preferred embodiment shows a connection between the two rings that includes a matching protrusion and recess, along with a line (7) running the length of the boundary between the first ring and the second ring cross section. ('556 Patent, Figure 1). The preferred embodiment thus illustrates a connection by means of a matching protrusion and recess. Whether the two layers are fused at some point in the preferred embodiment is not required by the illustration or the description thereof in the specification. In any event, it suffices that no such fusion, partial or otherwise, is required by the broad claim language "loosely connected." (*Id.* Col. 2, line 46).

■ Furthermore, the meaning of the connection described in claim 1 of the patent is informed by differentiation from dependent claim 2. "The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1312.[8] Here, claim 2 requires the second ring to be "integral" with the first ring. By implication, then, the rings described in claim 1 need not be "integral," or formed as a single unit. Therefore, claim differentiation provides further support for the court's construction of "loosely connected."

Finally, a broad construction is consistent with dictionary definitions of the claim terms, including dictionary definitions proposed by defendants. For example, defendants cite to dictionaries defining "connected" as "joined or fastened together," or "joined or linked together." (DE 55-4 at 4-5) (quoting The American Heritage Dictionary) (3d ed.1992) and Merriam Webster's Collegiate Dictionary (10th ed.1996). These definitions directly support construction of "loosely connected" as "joined or linked together." Similarly, defendants cite to dictionaries defining "loose" as "not rigidly fastened or securely attached," or "not taut, fixed or rigid." (*Id.*) Such definitions further support a broad construction in which the joining or linking together need not be done not through rigidly fastening or secure attachment, but rather some other means, such as protrusions or recesses in the context of the ring layers.

Nothing in the language of the claim terms, specification, or the common meaning of the term requires the additional limitation proposed by defendants, "so as to allow for partial separation without tearing." (DE 55-4 at 4). Defendants contend nonetheless that the construction of "loosely connected" must be limited by the later claim reference to "torn off" ('556 Patent, Col. 2, line 47), such that a portion of the connection can be separated with tearing and another portion can be separated without tearing. (*See* DE 66 at 24-25). In other words, defendants suggest that "loosely connected" must be limited by the term "torn off." But the opposite is true. In particular, as set forth further in the construction of the additional disputed terms below, the construction of "torn off" must be read in light of the broad requirement of two layers being "loosely connected" at a "predetermined location." ('556 Patent, Col. 2, lines 46-48).

---

8. A dependent claim is a claim that "contain[s] a reference to a claim previously set forth and then specif[ies] a further limitation of the subject matter claimed." 35 U.S.C. § 112 ¶ 4. By contrast, an independent claim does not incorporate by reference any claim previously set forth. *See id.* § 112 ¶ 3.

In sum, "loosely connected to said first ring" means "joined or linked to the first ring."

### 4. "torn off"

- Plaintiff's proposed construction: "the second, or inner sealing ring can be disconnected from, peeled off, pulled apart, or otherwise separated from the first ring."
- Defendants' proposed construction: "irreversibly severing or breaking a permanent physical connection."
- Court's construction: "separated, pulled apart, or removed, by application of force."

The term "torn off" describes the manner in which the loosely connected first and second rings can be separated at a predetermined location. (*See* '556 Patent, Col. 2, lines 46–48). The meaning of the term is informed by its context within the claims. In particular, the claim describes the separation of the two rings, where such rings are "loosely connected," and where the second ring is "adapted to be torn off said first ring at a predetermined location." (*Id.*). Because the rings are "loosely connected" as opposed to being integral or fused together, the term "torn off" must be understood to accommodate various means of separation of the two rings. In addition, because such separation is proscribed or "adapted to be" done at a "predetermined location," as opposed to just any point where the two rings could be severed or broken, the term "torn off" must be understood to be a deliberate application of force by a user of the invention.

The meaning of the term is further informed by the specification. In particular, the patent abstract describes the second ring "connected [to the first ring] in a manner which will allow *easy disconnecting* the second ring from the first ring." ('556 Patent, Abstract) (emphasis added).

The nature of the connection between the two rings thus determines the manner in which the two rings may be separated. Because the connection between the two rings is loose, the patent allows for "easy disconnecting" of the two rings. (*Id.*). Similarly, the "Abstract of Disclosure" in the specification states that the second ring is "loosely connected to said first ring *which enables* the tearing off of said second ring." (*Id.*, Col. 1, lines 46–47) (emphasis added). Again, the loose connection impacts the nature of the separation of the two rings, supporting a broad definition of "torn off."

A broad construction of the term further is consistent with the plain meaning of the term, which commonly is defined as "*to separate* parts of or *pull apart* by force" or "*to remove* by force." http://www.merriam-webster.com/dictionary/tear (defining "tear" 1a and 3a) (emphasis added).

In sum, in light of the context in which the term "torn off" is used, the term must be construed broadly to mean "separated, pulled apart, or removed, by application of force."

Defendants urge, nonetheless, a narrower construction of the term "torn off," for several reasons. First, defendants argue that the specification requires an understanding of "tearing" distinct from "separating," based on a clause in the specification stating that the second ring "could be removed by tearing and separating between the two parts," where "[t]he tearing off is made along a thin connection line 7." ('556 Patent, Col. 2, lines 13–14). This sentence, however, does not narrow the scope of the claim term "torn off" to the extent defendants urge. As an initial matter, the specification here is describing a preferred embodiment of the invention, and does not use words of "manifest exclusion or restriction" to limit the claim terms. *Innova/Pure*, 381 F.3d at 1117.

In addition, read in context with the claim term "loosely connected," "tearing" and "separating" need not be read as two separate mutually-exclusive actions, but rather two ways of describing one action.

Second, defendants argue that the prosecution history of the patent requires construing "torn off" narrowly. Defendants cite an effort in the patent application process to distinguish sealing rings described in another patent, Straub:

> Claim 1 also requires that the second ring is adapted to be torn off the first ring. The rings 15, 19, and 28 in Straub are separate elements, none of which is connected to the other and thus none of which is adapted to be torn off another such ring. Claim 1 thus defines novel structure over Straub for that additional reason.

(DE 64-13 at 5). This statement in the prosecution history, however, does not constitute a "clear and unmistakable disavowal" of the scope of the claim "torn off" as required by the language and context of the term in the claims. *3M Innovative Properties*, 725 F.3d at 1322. Rather, it distinguishes the present patent from one in which rings are "separate elements, none of which is connected to the other." (DE 64-13 at 5). In the patent in suit, by contrast, the rings necessarily are "loosely connected" to each other. ('556 Patent, Col. 2, line 46). As discussed previously, this loose connection may be by means of joining or linking the two rings together by means of one or more matching protrusions and recesses built into the rings. Thus, by distinguishing the Straub patent, the application does not clearly and unmistakably restrict "torn off" to an irreversible severing or breaking of a permanent physical connection.

Third, defendants cite to their expert's opinion that the term "torn off" is understood by a person skilled in the art to mean an irreversible severing of a perma-

nent physical connection. As part of the support for this opinion, the expert cites to numerous patents or patent applications in which "torn off" is used in a manner that reflects this meaning. (DE 63, ¶ 24). Reliance on such testimony and other patents by comparison, however, is flawed because none of these sources involves material "loosely connected" "adapted to be torn off" at a "predetermined location." ('556 Patent, Col. 2, lines 46-48).

Indeed, the contexts in which materials are "torn off" in those patents are much different from the context described in the first claim of the '556 patent, where the "torn off" term appears. For example, defendants describe patents in which "torn off" refers to "damage to material by chopping or tearing"; "severing of adherence"; tearing "through shearing accident"; tearing "due to fatigue fracture"; "fracturing or rupturing"; tearing by "shearing" or "shear forces." (DE 63, ¶ 24). Notably, while these patents describe an accidental break or failure of material, the '556 patent describes by contrast a deliberate, not accidental, separation at a "predetermined location." ('556 Patent, Col. 2, lines 47-48). The patented structure is "adapted to be torn off," in other words, designed for "easy disconnecting," to enable separation of the two ring layers. (*Id.*, Col. 2, line 47, and Abstract).

In sum, defendants' arguments and extrinsic evidence cited therein do not take into account adequately the language and context of the term in the claims and specification. Based upon the foregoing, the term must be construed to take into account the other claim terms, such as "loosely connected," "adapted," and "at a predetermined location." (*Id.* Col. 1, line 46; Col. 2., lines 46-49).

Because it is more faithful to the language and context of the patent in suit, the court finds more credible the expert testi-

mony by plaintiff's expert rather than defendants' expert, on the subject of the meaning of "torn off" to a person skilled in the art. Plaintiff's expert testified that the meaning of "torn off" in the context of the patent in suit is different than what is meant by "tearing a piece of paper." (DE 74–4 at 204). Plaintiff's expert based this opinion on the language used in the patent and the prosecution history of the patent, noting: "the term torn off is very broad and could be used in a lot of different context so you have to use it in the context of the patent and I just quoted the context of the patent where it's loosely connected and easily torn off." (DE 74–4 at 203–205; 207).

Defendants criticize plaintiff's expert for not addressing the types of external sources cited by defendants' expert, arguing that the opinion of plaintiff's expert is "conclusory and supported by no citations to outside materials such as industry publications." (DE 66 at 18). It is well-established that "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318. Also unhelpful is the opinion of an expert who "is not one of skill in the relevant art." *Id.* In this case, however, with respect to the meaning of "torn off," plaintiff's expert has not offered merely a conclusory, unsupported assertion as to the definition of the claim term. Rather he has explained the development of his opinion based upon review of specific aspects of the intrinsic record, suggesting also that he has drawn from his extensive engineering experience, which qualifies him as one of skill in the relevant art of hydraulic pipe couplings. (*See* DE 74–4 at 206, 260–287). In accordance with the direction in *Phillips*, the court has relied primarily on intrinsic evidence in determining construction of the term "torn off," and testimony by plaintiff's expert further supports and is consistent with

that construction. *See Phillips*, 415 F.3d at 1318–19.

Based on the foregoing, "torn off" means "separated, pulled apart, or removed, by application of force."

### 5. *"at a predetermined location"*

- Plaintiff's proposed construction: "the surface area or boundary between the two seal rings."

- Defendants' proposed construction: "where the permanent physical connection fastens or joins the first and second gasket layers together."

- Court's construction: "at the area or boundary where the first and second rings are joined or linked together."

The meaning of the term "at a predetermined location" is informed by its plain language, its context within claim 1, and the specification. The location described is the area or boundary where the first and second rings are joined or linked together. By using the word "predetermined" the claim confirms that such area or boundary is a part of the "loose[ ] connect[ion]" between the first and second rings described earlier in claim 1. The figures in the specification provide an example of such "predetermined location" before the second ring is torn off, particularly figures 1 and 2, which show a boundary in the cross section view between the first and second ring layers. The predetermined location is specified as ·7, and the specification states that the second ring is "connected to said first sleeve part at 7," and the "tearing off is made along a thin connection line 7." ('556 patent, Col. 2, lines 10–14). In this manner, the specification reiterates the cross-reference between the predetermined location and the connection between the rings. While the specification cites an example of a "connection" between the rings, the claim more

broadly allows for "loosely connected" rings.

Defendants' proposed construction incorporates without justification limitations not required by the claims, particularly a "permanent physical connection." As explained previously, the term "loosely connected" does not require a permanent physical connection. As a result, the "predetermined location" where such connection takes place need not involve a permanent physical connection. Thus, "at a predetermined location" means "at the area or boundary where the first and second rings are joined or linked together."

### 6. "said second ring being adapted to be torn off ... at a predetermined location"

- Plaintiff's proposed construction: "the second, or inner sealing ring can be disconnected from, pealed off, pulled apart, or otherwise separated from the first ring."
- Defendants' proposed construction: "where the permanent physical connection between the first and second gasket layers can be irreversibly severed or broken."
- Court's construction: "the second, or inner sealing ring can be separated, pulled apart, or removed, by application of force, from the first ring at the area or boundary where the first and second rings are joined or linked together."

■ The construction of the claim term "said second ring being adapted to be torn off ... at a predetermined location" follows from the court's construction of the disputed constituent parts. The only operative word not addressed directly in the prior discussion is "adapted to be." Both parties use "can be" in their constructions, and such construction is reflective of the plain language of the claim term and its context. Therefore, the term "said second ring being adapted to be torn off ... at a predetermined location" means "the second, or inner sealing ring can be separated by peeling off, pulling apart, or disconnecting from the first ring at the area or boundary where the first and second rings are joined or linked together."

### 7. "interconnect"

- Plaintiff's proposed construction: "to be connected with each other."
- Defendants' proposed construction: "connect."
- Court's construction: no construction required.

The claim term "interconnect" appears in the context of the final clause in claim one, "said second ring being adapted to be torn off said first ring at a predetermined location so as to adapt the sealing ring to interconnect pipes of substantially different diameters." ('556 Patent, Col. 2, lines 46–49). The term readily is understood by its plain language and context within the claim. The parties do not articulate why a construction of the term is necessary. Therefore, the court declines to construe the term.

### 8. "integral"

- Plaintiff's proposed construction: "the two rings are necessary to complete the unit."
- Defendants' proposed construction: "molded of one piece."
- Court's construction: "formed as a unit."

■ The claim term "integral" appears in claim 2, distinguishing the ring described in claim 2 from the one described in claim 1. Claim 2 recites "[a] sealing ring as claimed in claim 1 where said second ring is integral with said first ring." ('556 Patent, Col. 2, lines 50–51). The meaning of "integral" is informed by its plain lan-

guage and context, where claim 2 uses "integral" as an adjective distinguished from the "loosely connected" rings described in claim 1. When used in this manner, referring back to the two rings "comprising" the sealing ring claimed in claim 1, ('556 Patent, Col. 2, lines 43–45), the term necessarily denotes that the two rings described in claim 2 are formed as a unit.

This construction is consistent with the plain meaning of the word "integral," when used in reference to another part of an object, as here. *See* DE 55–4 (quoting Merriam Webster's Collegiate Dictionary (10th ed.1996)); *see also* http://www. merriam-webster.com/dictionary/integral ("integral ... 1 ... c: formed as a unit with another part <a seat with *integral* headrest>"). The definition proposed by plaintiff, by contrast, is unhelpful and inconsistent with the context of the claim. Plaintiff's proposed construction implies that the two rings are not necessary to complete the "sealing ring" unit described in claim 1. Claim 1 makes clear, however, that both the first ring and the second ring are necessary to complete such unit, because it describes the "sealing ring comprising" both the first ring and second ring. ('556 Patent, Col. 2, lines 43–45).

In sum, "integral" means "formed as a unit."

### 9. "substantially different diameters"

- Plaintiff's proposed construction: No construction required. To the extent the Court deems construction is required: "a difference in outside pipe diameters such that a seal preventing leakage of fluid will not be created by a pipe connector means with the same sealing ring on both ends."

- Defendants' proposed construction: Indefinite.

- Court's construction: "a difference in outside pipe diameters such that a seal preventing leakage of fluid will not be created by a pipe connecter means with the same sealing ring on both ends."

▮▮ Plaintiff contends no construction of the term is required, but proposes a construction if one is required. Defendants, by contrast, do not propose a construction but rather contend that the term is indefinite. For the reasons stated below, the term as construed is not indefinite.

▮▮ "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.,* —— U.S. ——, ——, 134 S.Ct. 2120, 2124, 189 L.Ed.2d 37 (2014). Defendants carry the burden of showing invalidity due to indefiniteness. *See Apple Inc. v. Samsung Electronics Co.,* 786 F.3d 983, 1003 (Fed. Cir.2015).

▮▮ "When a word of degree is used, the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.,* 783 F.3d 1374, 1378 (Fed. Cir.2015) (internal quotations omitted). "Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Id.* (quotations omitted). In addition, "[t]he degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Id.* at 1382.

The term "substantially" has been held not indefinite in other patent cases where the bounds of the claim term can be deter-

mined with reasonable certainty. *See, e.g., Apple Inc.,* 786 F.3d at 1003 ("substantially centered" not indefinite); *Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349, 1359 (Fed. Cir.2012) ("substantially planar" not indefinite); *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325, 1335 (Fed.Cir.2010) ("not interfering substantially" not indefinite); *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1377 (Fed. Cir.2001) ("to increase substantially" not indefinite); *see also Freeny v. Apple Inc.,* No. 2:13–CV–00361–WCB, 2014 WL 4294505, at *4 (E.D.Tex. Aug. 28, 2014) (Bryson, C.J., sitting by designation) (collecting cases). Notably, the Federal Circuit has recognized the utility of "substantially" as a term of degree, "where the term 'substantially' is a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1367 (Fed.Cir.2001) (internal quotations omitted).

Here, defendants have not met their burden of showing that the term "substantially different diameters" is indefinite. The subject matter of the patent, interconnection of two pipes, is straightforward, and "[t]he degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Biosig,* 783 F.3d at 1382. When "read in context of the invention," the term provides enough certainty of the meaning of the term to one of skill in the art. *Id.* at 1378. In particular, the specification provides descriptions and examples of use of the patented seal with pipes of different diameters, including those that are substantial and those that are not substantial:

> FIGS 3, 4, and 5 demonstrate a few possibilities of using the seal with different size pipes.

> In FIG. 3 only the first part 1 is being used even though the pipes are of different diameter, however the difference is *not substantial.* As can be seen the seal

is placed within a circumferential ring 8 being part of connector body 10.

> FIG. 4 demonstrates the use of the combined version of the seal while FIG. 5 illustrates the use of a seal when one side is used only with the inner part 1 of the seal while the other side is with the seal and second ring 5....

> FIG. 6 illustrates a "double" seal namely the same seal having two sides to be used with a two sided connector.

('556 Patent, Col. 2, lines 18–39) (emphasis added). In this manner, the term and the specification together make clear that pipes of "substantially different diameters" need not be determined with mathematical precision by a "strict numerical parameter," *Ecolab,* 264 F.3d at 1367, but rather by considering the relative difference of pipe sizes. In some instances, as in Figure 4, pipes of different diameter, but "not substantial[ly]" different diameters, can be connected with the seal comprised of both rings. ('556 Patent, Col. 2, line 23). In other instances, as in Figure 5, where the difference in pipe diameters is substantial, one side of the connecter may have a seal comprised of both rings, whereas the other side may have a connector comprised of only the first sealing ring. (*See id.;* lines 26–28).

The specification explains that the difference between these two scenarios is informed by experience in the field. In particular, "[e]xperience has shown that in order to be able to connect two pipes of different diameters when the difference between the diameter of the pipe s[sic] is more substantial it is necessary to use a special connecter both ends of which being of different diameter." ('556 Patent, Col. 1, lines 17–21). In this manner, this description further emphasizes that strict mathematical precision is not required, and that the option of a seal comprising a

single or double ring is intended to maximize the utility of the invention.

The practical meaning of "substantially different diameters" is reflected in the description of the term by plaintiff's expert, who opined that the term is understood by persons of ordinary skill in the art to mean "a difference in outside pipe diameters such that a seal preventing leakage of fluid will not be created by a pipe connecter means with the same sealing ring on both ends." (DE 74–4 at 243–44). The expert thus describes "substantially different diameters" in functional terms, rather than in absolute numerical values. (*See* DE 74–4 at 246). A functional construction is consistent with the language of the claim and the description in the specification.

Defendants, by contrast, have not provided any evidence that the understanding of the meaning of the term by plaintiff's expert is incorrect. Defendants point to references in the specification, which they contend are inconsistent and confusing. For example, defendants note that the specification refers at one point to a difference that is "more substantial," and another point to a difference that is "quite substantial." ('556 Patent, Col. 1, lines 19 and 35). However, read in context of the claims and the patent as a whole, the various references to "substantial" in the specification provide sufficient guidance to persons of ordinary skill in the art of the practical and functional nature the term "substantially different diameters."

Defendants also criticize plaintiff's expert's opinion because it is not supported by "any technical publications or other independent sources," and is nothing but his "unsupported personal say-so." (DE 66 at 27). As noted previously, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318. Neither is the opinion of an expert who "is not one of skill in the relevant art." *Id.* In this case, however, with respect to the meaning of "substantially different diameters," plaintiff's expert has not offered merely a conclusory, unsupported assertion as to the definition of the claim term. Rather he has explained the development of his opinion based upon review of specific aspects of the intrinsic record, suggesting also that he has drawn from his extensive engineering experience, which qualifies him as one of skill in the relevant art. (*See* DE 74–4 at 242; 243–249; 260–291). In accordance with the direction in *Phillips*, the court has relied primarily on intrinsic evidence in determining construction of the term, and testimony by plaintiff's expert further supports and is consistent with that construction. Thus, defendants have not provided sufficient reason to discredit such testimony. *See Apple Inc.*, 786 F.3d at 1003.

In sum, "substantially different diameters" is not indefinite, where construed to mean "a difference in outside pipe diameters such that a seal preventing leakage of fluid will not be created by a pipe connecter means with the same sealing ring on both ends."

### 10. "said seal"

- Plaintiff's proposed construction: "a device that joins two elements so as to prevent leakage."
- Defendants' proposed construction: Indefinite.
- Court's construction: "the sealing ring as claimed in claim 1."

Defendants argue that the term is indefinite because it lacks antecedent basis. For the reasons stated below, the term as construed is not indefinite.

In pertinent part, claim 3 provides for "A sealing ring as claimed in claim 1 where *said seal* is incorporated with connecting

means...." ('556 Patent, Col. 2, lines 52–53 (emphasis added)). By its plain language, "said seal" refers to the immediately preceding reference, "[a] *sealing ring* as claimed in claim 1." (*Id.* (emphasis added)). In addition, because claim 3 is a dependent claim, claim 1 provides an additional antecedent reference for "said seal," particularly "a *sealing ring* for pipe connector means, ... the *sealing ring* comprising ... so as to adapt the *sealing ring* to interconnect pipes of substantially different." (*Id.,* lines 42–49 (emphasis added)). Furthermore, the specification describes "*[t]he seal* according to the invention," and the figures "demonstrate three ways of the use of *the seal* with respective connecting means." (*Id.,* Col. 1, lines 39, 55–56 (emphasis added)).

In sum, "said seal" as used in claim 3 is "the sealing ring as claimed in claim 1," and because the antecedent reference is plain from the language of the claim, the term is not indefinite as asserted by defendants.

### 11. *"connecting means"*

- Plaintiff's proposed construction: No construction required. To the extent required, "a mechanism that connects the sealing ring to the pipe connector means."
- Defendants' proposed construction: Indefinite.
- Court's construction: No construction required.

Defendants argue that the term is indefinite because it is a "means-plus-function" limitation that is indefinite because the specification does not disclose a structure corresponding to "connecting means." For the reasons stated below, the term by its plain language is not indefinite in the manner asserted.

According to paragraph six of § 112, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. "To invoke this statute, the alleged means-plus-function claim element must not recite a definite structure which performs the described function." *Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 531 (Fed.Cir.1996) "Patent drafters conventionally achieved this by using only the words 'means for' followed by a recitation of the function performed." *Id.*

"[U]se of the word 'means' in a claim element creates a rebuttable presumption that § 112, para. 6 applies." *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1348 (Fed.Cir.2015). "Merely because a named element of a patent claim is followed by the word 'means,' however, does not automatically make that element a 'means-plus-function' element under 35 U.S.C. § 112, ¶ 6." *Id.* Rather, "the essential inquiry is ... whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.*

For example, the Federal Circuit has observed that "[a]n element with ... a detailed recitation of its structure, as opposed to its function, cannot meet the requirements of the statute." *Cole,* 102 F.3d at 531. In such a case, "the claim drafter's perfunctory addition of the word 'means' did nothing to diminish the precise structural character of this element." *Id.*

In this case, the term "connecting means" is followed by a precise structural recitation, as opposed to a description of function performed. In particular, claim 3 describes "connecting means *provided with a U shape ring and placed within said U shaped ring.*" ('556 Patent, Col. 2, lines 53–54 (emphasis added)). The claim

does not use the words "means for," and the word "means" is not followed by "a recitation of the function performed." *Cole*, 102 F.3d at 531. Accordingly, the term "connecting means" is not a "means-plus-function" term, and the requirements of § 112 ¶ 6 do not apply. *See id.* Therefore, the term is not indefinite as defendants contend for failing to meet such requirements. *See id.*

In sum, the term "connecting means" requires no construction and is not indefinite in the manner asserted by defendants.

**12. "U shape ring" and**

**13. "U shaped ring"**

- Plaintiff's proposed construction: "a device formed in the shape of a ring with a cross-section that is substantially U-shaped when viewed from the longitudinal/transverse or end."
- Defendants' proposed construction: Plain and ordinary meaning.
- Court's construction: No construction required.

The term "U shape ring" and "U shaped ring" appears in claim 3, which discloses a "connecting means provided with a U shape ring and placed with said U shaped ring." ('556 Patent, Col. 2, lines 53–54). The plain language of the term discloses a structure being a ring in the shape of a U. The term has two parts contributing to its meaning. On the one hand a "ring" readily is understood to be in the form of a circle. On the other hand, a U shape reflects the shape of the letter "U," having an open top and sides that may have some variation in shape depending on the font employed. As such, where some variation is inherent in the letter "U," plaintiff's proposed addition of the word "substantially" to describe the U shape is unnecessary. The additional notation that the U shape is seen from the "longitudinal/transverse or

end" extends the construction beyond the plain language of the term, which does not itself specify a particular placement of the U shape ring. The placement of the U shape ring rather is described by claim 3 as a whole, in conjunction with the specification. Accordingly, no construction of "U shape ring" and "U shaped ring" is required.

**14. "incorporated with connecting means provided with a U shape ring and placed within said U shaped ring"**

- Plaintiff's proposed construction: "a device formed in the shape of a ring with a cross-section that is substantially U-shaped."
- Defendants' proposed construction: Indefinite.
- Court's construction: No construction required.

Defendants argue that the term is indefinite because it includes indefinite individual terms. For the reasons discussed above, the individual terms "said seal" and "connecting means" are not indefinite. Therefore, the final disputed term incorporating said individual terms is not indefinite. No further construction of this disputed term is required.

**CONCLUSION**

The court has construed the disputed claim terms as set forth herein. Pursuant to the case management order, fact discovery shall be completed within 120 days from the date of this order. Expert discovery closes 135 days after the close of fact discovery, and dispositive motions are due 30 days after the close of expert discovery.

SO ORDERED.

Exhibit A

402

(12) **United States Patent**

Krausz

(10) Patent No.: **US 6,293,556 B1**

(45) Date of Patent: **Sep. 25, 2001**

(54) **SEAL FOR COUPLING AND CONNECTING MEANS**

(75) Inventor: Eliezer Krausz, Tel Aviv (IL)

(73) Assignee: Krausz Metal Industries, Ltd., Tel Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/156,288

(22) Filed: Sep. 17, 1998

(30) **Foreign Application Priority Data**

Sep. 18, 1997 (IL) ...................................... 121796

(51) Int. Cl.[7] ............................................... F16L 17/00
(52) U.S. Cl. ........................... 277/549; 285/110; 285/369; 277/551
(58) Field of Search ................................... 277/549, 551, 277/565, 592, 573, 3, 4; 285/110, 369, 231

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 293,734 | 2/1884 | Harrison . |
| 3,315,970 | 4/1967 | Holloway . |
| 3,432,189 | 3/1969 | Buller . |
| 3,486,772 | 12/1969 | Elsner . |
| 4,480,860 * | 11/1984 | Foresta et al. ..................... 285/177 |
| 4,824,148 | 4/1989 | Grabowski . |
| 5,203,594 * | 4/1993 | Straub ................................ 285/110 |
| 5,257,834 | 11/1993 | Zeidler et al. . |
| 5,314,213 * | 5/1994 | Heister et al. .................. 285/369 |
| 5,476,292 * | 12/1995 | Harper .......................... 285/369 |
| 5,941,576 * | 8/1999 | Krausz .......................... 285/110 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2098297 | 5/1982 | (GB) . |
| 114078 | 11/1997 | (IL) . |

* cited by examiner

Primary Examiner—Anthony Knight
Assistant Examiner—Enoch E. Peavey
(74) Attorney, Agent, or Firm—Kilpatrick Stockton LLP

(57) **ABSTRACT**

Coupling and Connecting Means for pipes of the same or different diameters and a seal to be used with such connecting means. The seal being a ring shaped seal made of rubber or other resilient material is composed of two ring parts the first one seated over the second one and connected thereto in a manner which will allow easy disconnecting the second ring from the first ring.

**3 Claims, 3 Drawing Sheets**

**Fig. 1**

**Fig. 2**

404

Fig. 3

Fig. 4

Fig. 5

*Fig. 6*

## 1

### SEAL FOR COUPLING AND CONNECTING MEANS

#### FIELD OF INVENTION

The present invention relates to coupling and connecting means to be used with pipes of same or different diameters made of all kinds of material and more particularly to the sealing means for such connecting means.

There are known a very large variety of means for connecting two abutting pipes whether of the same or different material. The sealing means of such connectors in most cases is a rubber ring or other resilient material.

In Israeli Patent Application No. 114078 there is described and claimed a connector similar to the connector subject matter of the present application.

Experience has shown that in order to be able to connect two pipes of different diameters when the difference between the diameter of the pipe s is more substantial it is necessary to use a special connector both ends of which being of different diameter.

#### OBJECTS OF INVENTION

It is thus the object of the present invention to provide a novel seal for coupling and connecting means, to be used when the diameter of two abutting pipes is the same or differ.

It is a further object of the present invention to provide a seal of novel cross section.

It is a further object of the present invention to provide a seal made of two parts which could be used as a whole or one part thereof.

By using two sizes of such seal a connector of a given diameter could be used for connecting two pipes of different diameter, the difference of which could be quite substantial.

#### ABSTRACT OF DISCLOSURE

The seal according to the invention is placed within a U-shaped ring which is placed over an outwardly flaring circumferential flange of a connector's barrel shaped body.

According to the invention there is provided a sealing ring made of resilient material comprising a first sleeve-like ring, the cross section of which defines a space therein, and a second ring overriding the first sleeve-like ring and being loosely connected to said first ring which enables the tearing off of said second ring.

#### SHORT DESCRIPTION OF DRAWINGS

The invention will now be described with reference to the annexed drawings in which:

FIG. 1 is a cross section of a seal profile,

FIG. 2 is a cross section of a seal profile embodiment,

FIGS. 3, 4, and 5 demonstrate three ways of the use of the seal with respective connecting means, and

## 2

FIG. 6 illustrates an embodiment of a seal according to the invention.

#### DESCRIPTION OF PREFERRED EMBODIMENT

Turning first to FIG. 1 the seal which is made of resilient material such as rubber or the like. The seal is divided into two main parts, the first part 1 being a sleeve-like ring which is preferably provided with inner space 3 to which reference will be made, and the second ring part 5 which is connected to said first sleeve part at 7.

Said second ring part 5 rides over said first sleeve 1 and could be removed by tearing and separating between the two parts. The tearing off is made along a thin connection line 7.

Said second ring part 5, as can be seen, provides said first sleeve part with additional thickness thus enabling to connect tight seal smaller diameters pipe.

FIGS. 3, 4, and 5 demonstrate a few possibilities of using the seal with different size pipes.

In FIG. 3 only the first part 1 is being used even though the pipes P are of different diameter, however the difference is not substantial. As can be seen the seal is placed within a circumferential ring 8 being part of connector body 10.

FIG. 4 demonstrates the use of the combined version of the seal while FIG. 5 illustrates the use of a seal when one side is used only with the inner part 1 of the seal while the other side is with the seal and second ring 5.

The inner space 3 is in communication with the liquid within the pipes thus when pressured fluid is delivered through the pipes said fluid enters space 3 and applies pressure therein which inevitably adds to the tightening of seal.

It is quite apparent that by using the seal according to the invention as a whole of just the first part the same connector 10 could be used with different sizes of pipes.

FIG. 6 illustrates a "double" seal namely the same seal having two sides to be used with a two sided connector.

What is claimed is:

1. A sealing ring for pipe connector means made of resilient material, the sealing ring comprising a first sleeve-like ring the cross section of which defines a inner space therein, and a second ring overriding said first sleeve-like ring and being loosely connected to said first ring, said second ring being adapted to be torn off said first ring at a predetermined location so as to adapt the sealing ring to interconnect pipes of substantially different diameters.

2. A sealing ring as claimed in claim 1 where said second ring is integral with said first ring.

3. A sealing ring as claimed in claim 1 where said seal is incorporated with connecting means provided with a U shape ring and placed within said U shaped ring.

* * * * *

US006293556C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (9125th)
# United States Patent
Krausz

(10) **Number:** US 6,293,556 C1
(45) **Certificate Issued:** Jul. 10, 2012

(54) **SEAL FOR COUPLING AND CONNECTING MEANS**

(75) Inventor: **Eliezer Krausz**, Tel Aviv (IL)

(73) Assignee: **Krausz Industries Development Ltd.**, Tel Aviv (IL)

Reexamination Request:
No. 90/011,858, Aug. 12, 2011

Reexamination Certificate for:
Patent No.: **6,293,556**
Issued: **Sep. 25, 2001**
Appl. No.: **09/156,288**
Filed: **Sep. 17, 1998**

(51) **Int. Cl.**
*F16J 15/32* (2006.01)
*F16L 17/00* (2006.01)

(52) **U.S. Cl.** ..................... 277/549; 285/110; 285/369; 277/551

(58) Field of Classification Search ...................... None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,858, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*--Beverly M. Flanagan

(57) **ABSTRACT**

Coupling and Connecting Means for pipes of the same or different diameters and a seal to be used with such connecting means. The seal being a ring shaped seal made of rubber or other resilient material is composed of two ring parts the first one seated over the second one and connected thereto in a manner which will allow easy disconnecting the second ring from the first ring.

Exhibit A—Continued

US 6,293,556 C1

# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims 1-3 is confirmed.

* * * * *